UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELISA EDWARDS, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | *   Civil Action No. 19-cv-12330-ADB |
| GRANITE TELECOMMUNICATIONS, | * |
| INC., | * |
| Defendant. | * |
| | * |
| | * |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Elisa Edwards ("Edwards") alleges that her former employer, Granite

Telecommunications, Inc. ("Granite"), breached the parties' contract when it unlawfully

terminated her and withheld earned wages (Count I).  Edwards also claims that Granite's failure

to pay was in violation of the Massachusetts Wage Act ("MWA") (Counts II–V), and further

asserts common law claims of quantum meruit (Count VI), unjust enrichment (Count VII), fraud

(Count VIII), and negligent infliction of emotional distress (Count IX).  Presently pending before

the Court is Granite's motion for summary judgment on all counts.  [ECF No. 35].  For the

following reasons, Granite's motion, [ECF No. 35], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

Granite has also filed a motion to strike, [ECF No. 59], which is <u>DENIED</u> with leave to

renew.

I.      **BACKGROUND**

A.      **Granite's Motion to Strike**

Granite has filed a motion to strike that objects to and asks to strike portions of Edwards'

responsive statement of material facts.  [ECF No. 59].  Edwards did not respond to the motion to

strike.  Federal Rule of Civil Procedure 56(c)(2) allows a party to object to material cited in support of a disputed fact if that material "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Because the objections in the motion to strike affect the factual record to be considered when ruling on the summary judgment motion, the Court addresses them first.

The statements of fact required under Local Rule 56.1 are "designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'"  Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).  When a party opposing summary judgment fails to dispute the facts presented by the moving party, those facts are deemed admitted.  Id.; D. Mass. R. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.").  Consequently, the portions of parties' statements of undisputed material facts that are not specifically controverted with support in the record are deemed admitted.

In general, the Court notes that marginally relevant statements, by definition, do not create a genuine issue of material fact, and the Court will give little to no consideration to them.  See McLaughlin v. McDonald's Corp., 203 F.R.D. 45, 50–51 (D. Mass. 2001); Terry v. SimplexGrinnell LP, No. 11-cv-40117, 2013 WL 1332240, at *1 (D. Mass. Mar. 28, 2013).

1.     Statements Not Supported by Citation

Granite moves to strike several paragraphs in Edwards' statement of facts because she: (1) cites to evidence that does not actually support the alleged fact; or (2) does not cite to anything at all.  [ECF No. 59 at 4–23].  At the summary judgment stage, unsupported allegations

2

need not be credited and the Court has not relied on any purported facts that are not supported by materials in the record when ruling on the pending motions.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).  Similarly, the Court has also not relied on any portion of Edwards' statement of facts that is unsupported by the record evidence she cites to, namely her deposition testimony and Granite's Regional Vice President Shane Hoff's ("Hoff") deposition testimony.

2.      Inadmissible Hearsay

Granite moves to strike paragraphs 15 and 16 of Edwards' responsive statement of material facts because they are inadmissible hearsay.  [ECF No. 59 at 4–23].  While it is true that "hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted[,]" Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016) (internal quotation marks and citations omitted), "a district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial," SEC v. Ramirez, No. 15-cv-2365, 2018 WL 2021464, at *15 (D.P.R. Apr. 30, 2018).  Paragraphs 15 and 16 refer to statements made to Edwards by Rodney Gaddy ("Gaddy").  [ECF No. 49 at 3].  Because Edwards has identified Gaddy as witness who will testify at trial, see [ECF No. 49 at 10 n.2], the statements made in the two paragraphs that Granite has challenged can be made admissible by Gaddy's testimony at trial, see Yourga v. City of Northampton, 474 F. Supp. 3d 408, 416 (D. Mass. 2020) (challenged evidence may be made admissible by calling available witness to testify at trial).

For these reasons, Granite's motion to strike is DENIED with leave to renew.

B.     **Factual Background**

Except as otherwise noted, the following facts are undisputed.[1]

1.     Edwards' Hiring

Granite is a Delaware limited liability company with a principal place of business in Quincy, Massachusetts.  [ECF No. 37 ¶ 2].  In May 2016, Granite hired Edwards, a resident of Atlanta, Georgia, as an entry-level Regional Account Manager in its Atlanta office.  [Id. ¶¶ 1,4]. This was an at-will sales position where Edwards was expected to "cold-call assigned prospective business customers, build and maintain a consistent sales funnel and pipeline and create customized sales proposals with the goal of selling Granite's telecommunications services."  [Id. ¶ 7].  Edwards' annual base salary for this role was $50,000.  [Id. ¶ 8].  She also was eligible to earn incentive compensation in the form of commissions for products and services she sold to customers or prospective customers assigned to her.  [Id.].

2.     The Compensation Plan

Edwards' eligibility for any commission payments was governed by Granite's Business Development Account Manager Compensation Plan (the "Compensation Plan") and the Regional Account Manager Commission Letter ("Commission Plan") (together, the "Employment Agreement").  [ECF No. 37 ¶ 9; ECF No. 49 at 4–5 ¶ 27].

Under the Compensation Plan, Account Managers can earn commissionable "units" based on the number of sales made in that month, but only to clients assigned to them by Granite. [ECF No. 37 ¶¶ 14–16].  An Account Manager that fails to comply with Granite's compensation guidelines can be disciplined.  [Id. ¶ 16].

_____

[1] The Court draws the facts from Granite's statement of material facts, [ECF Nos. 37–39], Edwards' statement of material facts in response, [ECF No. 49], Granite's response to Edwards' statement of material facts, [ECF No. 59], and any documents referenced therein.

The Compensation Plan provides three main forms of incentive compensation to Account Managers, [ECF No. 37 ¶ 17; ECF No. 38-5 at 3–4 ("Granite Compensation Plan")], each calculated based on the number of units sold:

- "Upfront Commissions" are calculated based on the number of units sold by an Account Manager in a given month with certain defined exceptions.  [ECF No. 37 ¶ 18].

- "Residual Commissions" are calculated based on the amount Granite earns or "collects" on an already secured account assigned to an Account Manager in a given month with certain defined exceptions.  [Id. ¶ 19].  Only *Senior* Regional Account Managers are eligible for Residual Commissions under the Compensation Plan.  [Id. ¶ 20].

- "New Business" or "Premier" bonuses are flat dollar amounts paid based on sales achieved in the first six-months after a new account is secured with certain defined exceptions.  [Id. ¶ 21].

Additionally, the "Other Commission Sharing Rules" sub-section of the Compensation Plan permits Account Managers to share or split commissions with other Account Managers in additional agreements approved by a Granite Senior Vice President of Sales, who may assign commission shares and splits at their discretion.  [ECF No. 37 ¶¶ 23–24; Granite Compensation Plan at 6–7].  Finally, the Compensation Plan states that "[u]pon voluntary or involuntary termination of employment, for any reason with or without cause, Commissions will be paid only on those Products installed/completed up to the day of termination."  [Granite Compensation Plan at 8; ECF No. 37 ¶ 25].  Edwards signed the Compensation Plan on or about January 5, 2017.  [Id. ¶ 26; ECF No. 38-3].

3.     The Commission Letter

The "Commission Letter" defines an Account Manager's quotas, the unit value assigned to each product or service, and the monetary value of commissions assigned to each unit.  [ECF No. 37 ¶ 27; ECF No. 38-3 at 10–13 ("Commission Letter")].  The Commission Letter also sets a Monthly Unit Quota and a New Premier Account Unit Quota for each Account Manager.  [ECF No. 37 ¶¶ 28–30].  Edwards' Monthly Unit Quota was set at 50 units starting in the sixth month of her employment, which was the standard for all entry-level Account Managers.  [Id. ¶¶ 31–32].

4.     Edwards' Employment with Granite

Upon starting at Granite, Edwards was assigned a territory and a call list of potential business customers, which did not include Duke Energy Corporation ("Duke" or "Duke Energy").  [ECF No. 37 ¶¶ 52–53].  Granite contends that it expected Account Managers to average 100 calls per day to potential customers on this list.  [Id. ¶ 54].

During the interview and training process, other Granite employees told Edwards that it had taken them at least a year to close their first account from their assigned call list.  [ECF No. 49 at 2 ¶ 6].  While Edwards contends, and Granite does not dispute, that "she was among the top percentile of similarly situated employees in cold calls made per day from the call list she was provided[,]" [ECF No. 49 at 2 ¶ 7; ECF No. 59 ¶ 7], Granite argues that Edwards' had performance issues early on during her tenure with the company, see [ECF No. 37 ¶¶ 50–66].  These issues—which included arriving late, missing trainings, not reaching daily or weekly "dial" goals, and leaving early without notice—resulted in her immediate supervisor, Ankur Patel ("Patel"), issuing verbal warnings.  [Id. ¶ 58].

5.   <u>Duke Energy</u>

Sometime in the fall of 2016, Edwards requested permission from Patel and Hoff to pursue business from Duke through a personal contact she had at Duke.  [ECF No. 37 ¶ 70; ECF No. 49 at 3 ¶¶ 17–18].  Before making this request, Edwards had spoken to her cousin, Gaddy, who was the Vice President of Administration Services at Duke.  [<u>Id.</u> ¶¶ 67–68].  She learned that Duke was looking to overhaul its information technology system, and Gaddy told her that he could connect her with Duke's Chief Information Officer, "[p]rovided that it would be [Edwards'] deal."  [ECF No. 49 at 2 ¶¶ 14–16].  Edwards conveyed this information to Hoff, who explained to Edwards that the Duke account was assigned to another employee and that Granite's Energy Team would need to be involved with the deal, but that Edwards could share in any potential commissions.  [ECF No. 37 ¶¶ 72–78].  Duke was a potentially large and profitable client that Granite had been previously unable to secure despite its attempts.  [<u>Id.</u> ¶ 86; ECF No. 49 at 3 ¶ 13; ECF No. 59 ¶ 13].  Because Duke was not an account assigned to Edwards, Hoff offered the following commission split terms ("the November 2016 Commission Split") pursuant to his authority under the Compensation Plan, to which Edwards' agreed:

- Edwards would coordinate an introductory call between Granite and Duke Energy;

- all Upfront Commissions would be allocated 50% to Edwards and 50% between two members of the Energy Team;

- all Residual Commissions would be assigned 50% to Edwards and 50% split between the Energy Team; and

- Edwards would receive 100% of the New Deal Commission.  [<u>Id.</u> ¶¶ 78–79]; <u>see also</u> [ECF No. 49 at 3 ¶ 20].

Hoff has since stated that he included the Residual Commission clause only in the event that Edwards would be promoted to Senior Account Manager and thus become eligible for them. [ECF No. 37 ¶ 81].  Nonetheless, in a November 3, 2016 email, which included Edwards, Patel, and others, Hoff wrote "[s]plit 50/50 between Elisa and energy team for all upfront and residual commissions[,]" without any further qualification.  [ECF No. 49 at 4 ¶ 24; ECF No. 38-9 at 2].  Edwards expressed that she felt this arrangement was unfair but that she had "no choice" other than to agree to the split.  [ECF No. 49 at 3 ¶¶ 21–23].

Edwards then arranged for an introductory call between Granite and Duke personnel. [ECF No. 37 ¶ 83]; see also [ECF No. 49 at 5 ¶ 30].  According to Granite, between November 2016 and April 2017, it prepared various proposals for products and services and held numerous meetings and calls with Duke, but Duke did not buy.  [ECF No. 37 ¶¶ 84–87].  The extent of Edwards' involvement in these proposals is disputed.  Despite early promises assuring her involvement in the account, Edwards claims that, after setting up the initial meeting, Hoff "excluded her from numerous critical phases and major activity" and that she was not even named on the list of Granite team members in sales proposals provided to Duke.  [ECF No. 49 at 5–6 ¶¶ 33–36].

6.    The April 7, 2017 Duke Deal

On April 7, 2017, Granite finally secured a sale with Duke, which was valued at only 18[2] commissionable units, [ECF No. 37 ¶¶ 108, 116], much lower than the number that Hoff, Edwards, and others had anticipated, [id. ¶¶ 109–16].

---

[2] Parties interchangeably attribute 18 or 20 units to this deal for reasons unexplained, but the ultimate commission calculations based on these units are not disputed.

According to Granite, under the terms of the November 2016 Commission Split and the Employment Agreement, Edwards was entitled to 50% of all Upfront Commissions, 50% of all Residual Commissions should she become eligible, and 100% of the "New Business" or "Premier" bonus compensation for the sale of those units. [ECF No. 37 ¶ 117]. Under this formulation, Edwards received $250.00 in "New Business" or "Premier" bonus compensation, equal to 100% of the "New Business" or "Premier" bonus compensation based on the deal, [id. ¶ 118], and $140.00 in Upfront Commissions, which in fact amounted to 100% of Upfront Commissions generated from the deal, in excess of the 50% she agreed to in the November 2016 Commission Split, [id. ¶¶ 121–24]. Edwards does not dispute these calculations based on the 18 units, but disputes that this was the actual unit value of sales to Duke. Edwards testified during her deposition that she questioned Hoff's determination that the deal was only worth 18 or 20 units, because, as she understood it, discussions with Duke were still ongoing and a bigger deal was anticipated. See [ECF No. 49 at 7 ¶¶ 38–39; ECF No. 51-1 at 171:1–176:8]. Edwards claims that Granite's original projections for the deal would have resulted in approximately $1.7 million dollars in commissions. [ECF No. 49 at 7 ¶ 41; ECF No. 51-1 at 177:19–179:16].

7.    Edwards' Alleged Performance Issues and Termination

Granite asserts that Edwards' performance issues continued into 2017. [ECF No. 37 at ¶¶ 88–107]. She closed a second sales deal on an existing sales account that was transferred to her, but Patel still found her performance "lacking." [Id. ¶¶ 88, 91]. Edwards disputes that her performance was in any way below standard at any time during her employment with Granite. On or about March 15, 2017, Edwards told Hoff she believed Patel was treating her differently from other employees based on her race and gender and Hoff said to contact the Director of

Employee Relations, Lisa Mui ("Mui"), to raise these complaints formally.[3]  [Id. ¶ 92].  Edwards raised complaints with Mui on four separate occasions in March 2017.  [Id. ¶ 93].  Mui told Edwards that she was "unable to corroborate [her] allegations."  [ECF No. 38-13 at 2].  There is nothing in the record that suggests that Edwards raised the Duke deal or any earnings related to the Duke deal with Mui on these four occasions.

On March 24, 2017, Edwards was issued a verbal warning for failure to meet her 50-unit Monthly Quota, and "failure to develop a sustainable pipeline of opportunities."  [ECF No. 37 ¶ 94].  Granite asserts that, by the time of this meeting, Edwards had closed only two deals for a preexisting account and had not once met her 50-unit Monthly Quota since being hired in May 2016.  [Id. ¶ 95].  This warning resulted in the creation of new benchmarks for Edwards.  [Id. ¶ 97 (these new requirements included making 400 new dials, scheduling and attending four conference calls, providing a customer with one quote, having one potential deal review, and having one decision considered for validation in the week of March 27, 2017)].  Edwards argues that these heightened benchmarks were not connected to her performance, which was above-average, but were related to the Duke account and/or her race and gender, [ECF No. 49 at 7 ¶ 42], and were purposefully "setting her up to fail[,]" [id. at 8 ¶ 44].  Edwards alleges further unfair scrutiny that included "intens[e]" monitoring of her bathroom breaks and lunchtimes, in addition to higher quotas than colleagues in similar positions.  [Id. ¶ 43]; see also [ECF No. 51-1 at 192:9–193:8; 203:10–16; 211:2–212:9; 215:8–25].  Edwards additionally claims that Patel told her that Hoff was "out to get her" and that he was raising her quotas to try to "have [her] gone" before the Duke deal closed.  [ECF No. 49 at 10 ¶ 56]; see also [ECF No. 51-1 at 214:20–215:11].

---

[3] Edwards is African American.

On April 5, 2017, two days before the Duke deal was finalized, Edwards met with Hoff and Patel to discuss her performance, which Granite maintains was still subpar.  [ECF No. 37 ¶ 107].  On April 12, 2017, in an email to Hoff and Patel, copying Mui, Edwards raised her concerns about that meeting and about her commissions from the Duke deal.  [ECF No. 49 at 8 ¶ 47]; see also [ECF No. 38-21].  Edwards asserted that the warnings were "unsubstantiated" in light of the fact that she had already closed her third deal "in less than a year while others are closing their first post 1 [year] of being with Granite."  [ECF No. 38-21 at 12]; see also [ECF No. 49 at 8 ¶ 48].  In this email chain, Hoff and Granite go on to dispute Edwards' level of involvement in the Duke deal, whether she received appropriate permission before reaching out to Duke, her allegations of discrimination, and other details regarding her performance at Granite.  See [ECF No. 38-21].  In these emails, Hoff suggests that Edwards was already given disproportionate commission credit for the Duke deal when she "accomplished only the first step," while Edwards calls Hoff's assertions that she had "nothing to do with the closing . . . grossly inaccurate."  [Id. at 3–4.]

Edwards received another verbal warning on May 3, 2017, [ECF No. 37 ¶ 131], a written warning on May 15, 2017, [id. ¶ 134], and, on May 19, 2017, her employment was terminated for continued failure to meet job requirements, [id. ¶ 136].

Edwards asserts that Granite was "close" to signing up additional Duke business when she was terminated, which Granite disputes.  [ECF No. 49 at 13 ¶ 81].  It is undisputed, however, that Duke purchased additional services from Granite following Edwards' termination, totaling an additional 24.5 commissionable units and $7,380.33 in commission for Granite employees in 2017.  [ECF No. 49 at 13 ¶ 79; ECF No. 37 ¶¶ 139–42].

### C.      Procedural Background

On October 7, 2019, Edwards filed the instant action in Massachusetts Superior Court, alleging nine common law and MWA counts against Defendants Granite and Hoff.  Defendants removed the case to this Court on November 12, 2019.  [ECF No. 1].  On July 1, 2020, the Court granted Defendants' motion to dismiss the claims as to Hoff and consequently denied Edwards' motion to remand the case to state court.  [ECF No. 16].

On July 30, 2021, Granite moved for summary judgment on all claims.  See [ECF No. 35; ECF No. 1-1 (Complaint)].  Edwards opposed on September 1, 2021, [ECF No. 48], and Granite replied on September 15, 2021, [ECF No. 53].

## II.      LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran, 328 F.3d at 6 (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact the moving party must . . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-

moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## III.    DISCUSSION

 Granite moves for summary judgment on the MWA and breach of contract claims, asserting that Edwards has not raised any facts that dispute that she was paid what she was owed on the date of her termination, but that she is instead seeking an undeterminable amount of wages that she was never entitled to.  [ECF Nos. 35, 53].  Granite also asserts that it is entitled to

summary judgment on the unjust enrichment, quantum meruit, fraud, and negligent infliction of emotional distress claims as a matter of law.  [Id.].

## A.    Count I: Breach of Contract

Edwards alleges that Granite breached her Employment Agreement by firing her in bad faith to avoid paying her the additional Upfront and Residual Commissions it would have owed her based on Granite's continued sales to Duke, which she asserts were generated by work she already performed for Granite.  See [ECF No. 1-1, ECF No. 50].  Edwards' breach of contract claim is therefore based on a theory of breach of an implied covenant of good faith and fair dealing.[4]

Under Massachusetts law, first set forth in Fortune v. Nat'l Cash Reg. Co., 364 N.E.2d 1251, 1257 (Mass. 1977), an employer breaches an implied covenant of good faith and fair dealing in an at-will employee contract when the employer terminates the employee in bad faith in order to deprive the employee of her commissions.  Bohne v. Comput. Assocs. Int'l, Inc., 514 F.3d 141, 143 (1st Cir. 2008) (per curiam) (citing Fortune, 364 N.E.2d at 1257).  In Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21 (Mass. 1981), the Massachusetts Supreme Judicial Court further explained that proof of bad faith with the specific intent to deprive the employee of

---

[4] Edwards does not allege that she is owed additional Upfront Commission based on the 18-unit April 7, 2017 Duke deal.  She does, however, argue that Granite owes her Residual Commissions for the April 7, 2017 deal because the November 2016 Commission Split modified the Compensation Plan to make her eligible for Residual Commission without promotion, but this argument is unavailing.  Edwards admitted in her deposition testimony that she understood the November 2016 Commission Split would permit her to earn Residual Commissions only if the Duke deal resulted in her promotion to Senior Account Manager.  See [ECF No. 53 at 6; ECF No. 37 at ¶¶ 81–82].  Such earnings, available only upon the achievement of a milestone during active employment and unrelated to the compensation of services previously rendered, are not due to her at the time of her firing.  Suzuki v. Abiomed, Inc., 943 F.3d 555, 566 (1st Cir. 2019).  Furthermore, the evidence of record suggests that no possible Residual Commissions even existed at her termination date.  [ECF No. 53 at 5–6].

benefits is not necessarily required when an employee is discharged without good cause and such a deprivation results.  See Weiss v. DHL Express, Inc., No. 10-cv-10705, 2011 WL 13137940, at *5 (D. Mass. Nov. 16, 2011), R&R adopted, No. 10-cv-10705, 2011 WL 13141598 (D. Mass. Dec. 7, 2011), aff' sub nom. Weiss v. DHL Exp., Inc., 718 F.3d 39 (1st Cir. 2013).  As such, "[a]lthough termination of employment without good cause is not alone a breach of the implied covenant, an employer may sometimes be held liable for lost compensation if that compensation is 'clearly related' to the dismissed employee's 'past service.'"  Suzuki, 943 F.3d at 562 (quoting Gram, 429 N.E.2d at 28–29).  In other words, plaintiffs can only recover under the Fortune/Gram framework for "identifiable, future benefit[s] . . . reflective of past services," not "prospective benefits not thus tied to past services."  Sargent v. Tenaska, Inc., 108 F.3d 5, 8 (1st Cir. 1997) (internal citations omitted).

Granite asserts that Edwards' breach of contract claim cannot proceed because she seeks Upfront and Residual Commissions that fall outside the bounds of the Employment Agreement and/or that were not connected to her past performance, and that there are no triable issues as to bad faith.  [ECF Nos. 35, 53].  Contrary to Granite's assertions, the Court believes genuine disputes of fact remain regarding the circumstances surrounding Edwards' termination and whether Granite's additional sales to Duke were related to services that Edwards had already performed.

It is undisputed that Granite made more sales to Duke after the April 7, 2017 deal and the record contains admissions that the Duke deal would not have happened but for Edwards involvement.  Granite instructs the Court to rely on King v. Mannesmann Tally Corp., 847 F.2d 907, 907 (1st Cir. 1988), where the First Circuit, agreeing with the district court, found that an ex-sales employee was not entitled to commissions generated after his termination where his

entire claim rested on his role in acquiring a new client for his employer.  In <u>King</u>, however, the employee/appellee was terminated before negotiations with the new client even began and months before a single sale was made, leading the court to find that the compensation he sought from those sales was insufficiently related to his past services.  <u>Id.</u> at 908.  In this matter, however, Edwards remained employed at Granite throughout the negotiations process and the first sale, and there are genuine disputes of fact regarding her involvement with the Duke account after setting up the initial meeting and the imminency of further deals at the time of her termination.  This is not to say, as Granite suggests, that Edwards would be owed commission in perpetuity, but to the extent Granite generated additional revenue fairly connected to work she did while employed by Granite, she may be entitled to additional commission.  Edwards' claims are indeed broad, but there remain disputes of fact that would allow a reasonable factfinder to find in her favor.

As to Granite's motivations for her termination, Edwards contends that all of the actions taken by Granite after securing the initial meeting with Duke—excluding her from activity on the account, not assigning her to the Duke Energy team, subjecting her to unfair scrutiny, disregarding her complaints—all were bad faith attempts to set her up for failure and eventual termination.  [ECF No. 50 at 6–9].  Further, Edwards alleges that Patel, her direct supervisor, indicated to her that Hoff was seeking to terminate her specifically to avoid paying her additional commission on the Duke account.  [<u>Id</u>. at 8–9].  These types of factual disputes surrounding good cause must be reserved for a jury.  <u>Fine v. Guardian Life Ins. Co. of Am.</u>, No. 19-cv-30067, 2022 WL 673663, at *13 (D. Mass. Mar. 7, 2022) (citing <u>York v. Zurich Scudder Invs., Inc.</u>, 849 N.E.2d 892, 900 (Mass. App. Ct. 2006) then citing <u>Goldhor v. Hampshire Coll.</u>, 521 N.E.2d 1381, 1384 (Mass. App. Ct. 1988)).

Granite argues that Edwards' claims must nevertheless fail because she has failed to identify any evidence that she was denied compensation that she was "on the brink" of earning at the time of her termination, [ECF No. 53 at 6–9], but evidence of "on the brink" earnings is not the "dispositive issue on summary judgment" as Granite suggests, [id.].  "The 'on the brink' standard is not a necessary element of proof under the Fortune/Gram doctrine . . . . Rather, whether an employee is 'on the brink' of achieving a milestone at the time of discharge is simply one relevant data point in assessing an employer's true motive."  Suzuki, 943 F.3d at n.8 (internal citation omitted); accord Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec., 450 F. Supp. 3d 20, 34 (D. Mass. 2020).  Further, to the extent Granite asserts that Edwards cannot seek earnings related to "future" sales that were not yet "vested" on the date of her termination, that argument is also unavailing.  The First Circuit has held that "terms like 'vested' and 'unvested' do not automatically control" where the circumstances suggest bad faith that makes it "doubtful that Fortune could be shrugged off by saying that the interest had not yet vested."  Sargent, 108 F.3d at 8–9.  In this case, genuine disputes of fact remain regarding the circumstances of her termination.

Finally, Granite additionally avers that Edwards cannot recover the commissions she seeks because they are barred by the terms of her Employment Agreement, which expressly does not award her commissions for accounts not formally assigned to her or sales that occurred post-termination.  Courts in this circuit, however, have declined to adopt such a limitation of the Fortune/Gram doctrine.  See Fine, 2022 WL 673663, at *15; Krause v. UPS Supply Chain Sols., Inc., No. 08-cv-10237, 2009 WL 3578601, at *13 (D. Mass. Oct. 28, 2009).

Because Edwards was involved in the sales to the Duke account and there is a genuine, disputed issue as to whether her termination was without good cause, a reasonable factfinder

could determine that Edwards should recover commissions under a Fortune/Gram theory of breach, even if those commissions were not yet due under the strict terms of the Employment Agreement.  See Krause, 2009 WL 3578601, at *14.

Accordingly, Granite's motion for summary judgment is DENIED as to Count I.

### B.    Counts II–V: Violations of the MWA

"The MWA provides a cause of action for employees whose wages have been wrongfully withheld."  Drachman v. Bos. Sci. Corp., No. 16-cv-11022, 2016 LEXIS 186283, at *14 (D. Mass. Nov. 23, 2016).  To state a claim under the MWA, a plaintiff "must prove (1) he was an employee under the statute; (2) his deferred compensation constitutes a 'wage' under the statute; [and] (3) the defendants violated the [MWA] by not paying him his wages in a timely manner." Roma v. Raito, Inc., No. 13-cv-10297, 2015 WL 1523098, at *6 (D. Mass. Mar. 31, 2015) (alteration in original) (quoting Doucot v. IDS Scheer, Inc., 734 F. Supp. 2d 172, 192 (D. Mass. 2010)).  The MWA additionally prohibits employers from entering into a "special contract" with an employee to exempt the employee from the protections of the act.  Mass. Gen. Laws ch. 149, § 148.

"Where an employee is promised both a base salary and additional payments based 'on the amount of revenue [s]he generated' for her employer, those additional payments are 'commissions' subject to the Wage Act."  Feygina v. Hallmark Health Sys., Inc., No. 2011-cv-03449, 2013 WL 3776929, at *5 (Mass. Super. Ct. July 12, 2013) (quoting Okerman v. VA Software Corp., 871 N.E.2d 1117, 1119, 1122–25 (Mass. App. Ct. 2007)).  The terms of the MWA are applicable to commissions "when the amount of such commissions, less allowable or authorized deductions, has been *definitely determined* and has become *due and payable* to such employee."  Mass. Gen. Laws ch. 149, § 148 (emphasis added).

Granite asserts that the commissions Edwards seeks were neither "due and payable" nor "definitely determined" at the time of her termination, and, thus, she has not identified any deprivation of earned wages in violation of the MWA.  The Court agrees.

Relying on Israel v. Voya Institutional Plan Servs., LLC, No. 15-cv-11914, 2017 WL 1026416 (D. Mass. Mar. 16, 2017), Edwards contends that she is entitled to commissions under the MWA based on the additional revenue Granite generated from Duke sales made after her termination because those wages were earned while she was still employed at Granite, specifically, at the moment she "personally persuaded" Duke officials to establish an ongoing business relationship with Granite.  [ECF No. 50 at 14–15].  The facts of Voya, however, are distinguishable.  There, only the *calculation* of earned commissions post-dated plaintiff's resignation "due to the 3-month lag time in the payment of the variable component."  Voya, 2017 WL 102416, at *3.  Here, there is no claim that commissions based on additional sales to Duke were "due and payable" but delayed only by a calculation or any other approval period.  Instead, in this case, the Employment Agreement that Edwards signed expressly states that "Commissions will be paid *only on those Products installed/completed up to the day of termination*."  [Granite Compensation Plan at 7 (emphasis added); ECF No. 37 ¶ 25].  See similar Krause, 2009 WL 3578601, at *13.  Additionally, in Voya, there was "no real question that the amount was 'definitely determined[,]'" since the parties agreed on the exact amount plaintiff would have been paid had he remained employed.  Voya, 2017 WL 102416, at *7.  In this matter, even Edwards has not suggested a definitive amount of additional commissions owed to her, nor is there any fact in the record that suggests that the amount of additional revenue was definitely determinable at the time of her termination.

Because the Court finds that any commissions related to additional sales to Duke that occurred after her termination were not "due and payable" to Edwards, or "definitely determined," her MWA claims relating to the post-termination sales must fail as a matter of law.

Further, Edwards has not raised any fact that suggests that the November 2016 Commission Split violated the MWA as it did not result in the withholding of any unearned wages related to the April 7, 2017 deal. Edwards does not dispute that she was paid all Upfront and New Bonus Commissions owed to her by the deal in accordance with her Employment Agreement and she has not identified any provision of the Employment Agreement that the split violates.

As such, Granite's motion for summary judgment is <u>GRANTED</u> as to all MWA claims (Counts II–V).

### C.  Counts VI and VII: Quantum Meruit and Unjust Enrichment

Count Six asserts a claim for quantum meruit. "Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute." <u>Boswell v. Zephyr Lines, Inc.</u>, 606 N.E.2d 1336, 1342 (Mass. 1993). "Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered." <u>Id</u>. Here, it is clear that a valid compensation contract existed between Granite and Edwards. Accordingly, Granite's motion for summary judgment as to Count Six is <u>GRANTED</u>.

Counts Seven asserts a claim for unjust enrichment. An equitable claim for unjust enrichment is not available when the claiming party has an adequate remedy at law. <u>Santagate v. Tower</u>, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005). Here, Edwards' claims for breach of contract and violations of the MWA are legal remedies, and therefore she may not also pursue, at this stage, a claim for unjust enrichment. While such claims may proceed at the pleading stage,

as Edwards suggests, [ECF No. 50 at 17], this case is no longer at the pleading stage.
Accordingly, Granite's motion for summary judgment as to Count Seven is <u>GRANTED</u>.

### D.     Counts VIII and IX: Fraud and Negligent Infliction of Emotional Distress

Edwards does not oppose summary judgment on these two claims.  Therefore, it appears that Edwards has abandoned her claims for negligent infliction of emotion distress and fraud. <u>Montany v. Univ. of New Eng.</u>, 858 F.3d 34, 41 (1st Cir. 2017) (agreeing that plaintiff's "failure to put forth any argument in her opposition to defendants' motion for summary judgment . . . constitutes abandonment of any such claim"); <u>Kibbe v. Potter</u>, 196 F. Supp. 2d 48, 76 (D. Mass. 2002) (finding claim abandoned when party failed to mention it in his opposition brief); <u>Dressler v. Cmty. Serv. Commc'ns, Inc.</u>, 275 F. Supp. 2d 17, 26 (D. Me. 2003) (treating retaliation claim as abandoned when plaintiff failed to put forth any argument).  This alone is sufficient to grant summary judgment in Granite's favor.

Thus, Granite's motion for summary judgment as to Counts Eight and Nine is <u>GRANTED</u>.

## IV.     CONCLUSION

Accordingly, Granite's motion to strike, [ECF No. 59], is <u>DENIED</u> with leave to renew and Granite's motion for summary judgment, [ECF No. 35], is <u>GRANTED</u> in part as to Counts II–V (violations of the MWA), Count VI (quantum meruit), Count VII (unjust enrichment), Count VIII (fraud), and Count IX (negligent infliction of emotional distress), and <u>DENIED</u> in part as to Count I (breach of contract).

The parties shall appear before the Court for a status conference on <u>April 8, 2022</u> at <u>9:15 a.m.</u>

**SO ORDERED.**

March 31, 2022                                   /s/ Allison D. Burroughs
                                                ALLISON D. BURROUGHS
                                                U.S. DISTRICT JUDGE